In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00043-CV

                                                ______________________________

 

 

 

         IN THE INTEREST OF D.M.H. AND
K.M.H., MINOR CHILDREN

 

 

                                                                                                  


 

 

                                      On Appeal from the 102nd
Judicial District Court

                                                             Bowie County, Texas

                                                      Trial Court No. 09C0044-102

 

                                                    
                                              

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                            Memorandum Opinion by Justice Moseley








                                                     MEMORANDUM 
OPINION

 

            Appellant,
Marshall Shane Hicks, filed a notice of appeal May 28, 2010, from the trial court’s
order dated May 14, 2010, denying a change of venue.  

            The
trial court’s order is not a final, appealable judgment.  We have jurisdiction to hear an appeal from a
final judgment or from interlocutory orders as expressly authorized by
statute.  See Tex. Civ. Prac. &
Rem. Code Ann. § 51.012 (Vernon Supp. 2009), § 51.014 (Vernon 2008).  This order does not fit either criteria, and
we thus have no authority to consider the appeal.  In accordance with Tex. R. App. P. 42.3, we provided notice to Hicks, requesting
that he show this Court how we had jurisdiction over this appeal.  We have received Hicks’ response, and
considered it.  We do not find it to be
persuasive.

            We
dismiss this appeal for want of jurisdiction.

 

 

                                                                        Bailey
C. Moseley

                                                                        Justice

 

Date Submitted:          September 1, 2010

Date Decided:             September 2, 2010

 





 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00100-CR

                                                ______________________________

 

 

                                   DAVID LEN MOULTON,
Appellant

 

                                                                V.

 

                                                 THE
STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                         On Appeal from the 5th Judicial District Court

                                                              Cass County, Texas

                                                       Trial Court
No. 2008F00339

 

                                                        
                                          

 

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                          Opinion by Justice Carter








                                                                   O P I N I O N

 

            David
Len Moulton[1] and
Rebecca Moulton owned a home situated in a heavily wooded area.  The property contains a pond which lies
approximately 200–250 yards behind the house. 
Moulton found Rebecca floating in the middle of the pond, unresponsive,
and called 9-1-1.  Emergency medical
personnel were unable to revive her, and she was pronounced dead at Atlanta
Memorial Hospital.  A jury convicted
Moulton for the murder of Rebecca, his wife of sixteen years, and Moulton was
sentenced to sixty years’ imprisonment. 

            Moulton
appeals his conviction on the ground that the trial court’s jury charge, which
allowed the jury to convict Moulton of intentionally or knowingly causing the
death of Rebecca by asphyxiation by manner and means unknown to the grand jury,
was erroneous where the evidence at trial was insufficient to establish that
the manner and means was unknown. 
Moulton also complains that the trial court erred in refusing to quash
the State’s indictment, that his due process rights were violated because the
State failed to disclose Brady
material, and that the court erred in allowing a medical examiner to read to
the jury inadmissible narratives contained in the investigative file.  We agree with Moulton that the trial court’s
charge was erroneous, conclude the error was harmful, and reverse and remand
the court’s judgment on this basis only. 

I.          Factual
Background 

            A.        April 17, 2004––The Timeline

            On
the day of her death, Rebecca went to visit her parents, Carrel and Dean Byrum, who lived six to seven miles away.  At approximately 5:30 p.m., Dean drove
Rebecca back to her home.  Rebecca and
Moulton ordered a pizza.  Moulton
received a call from Ambrose James at around 5:50 p.m., requesting assistance
for a tree trimming job.  According to
Moulton, the pizza arrived just as he was leaving for the tree trimming job.[2]  Aaron Boatman, who delivered the pizza,
confirmed that Moulton and Rebecca were both home during the delivery, which
occurred around 6:30 p.m.  According to
Boatman, Moulton engaged in small talk, did not seem agitated, and Rebecca
appeared well and free to move around. 
Moulton testified that Boatman “was sitting in his car counting the
money when I got in my truck and drove off,” but Boatman, who never physically
saw the front door close, believed Moulton went into the house after the pizza
delivery.  

            Moulton
met James at the tree trimming job, two and a half miles away.  Moulton claimed to be at the job thirty to
forty-five minutes at the most.  Moulton
returned home between 6:50 and 7:20 p.m. at the latest.  Rebecca was not inside the home, although her
vehicle was parked in front.  She had a
habit of going walking with her friends. 
According to Moulton, he “waited 15, 20 minutes till he got worried and
started looking around” for her.  Dean
received a call from Moulton at 7:37 p.m. inquiring into Rebecca’s
whereabouts.  Moulton suggested, “Well,
maybe she’s walking with [her friend] Leigh.” 
Moulton called Leigh Soloman’s number, which
“turned out to be a computer line.”  He
went looking for Rebecca because it was getting dark. 

            Moulton
testified he walked to his truck, which was parked in front of the house, and
honked the horn.  When he heard no
response, he drove to the back of the property on the road and honked the horn
again.  Moulton stated, “I got back in my
truck and went down an old county road [driving trail] to the pond.  I did not immediately see Rebecca because I
was looking through the trees and they [sic] way I was parked, the dam and to
the pond would block my view.  I pulled up
further and saw” Rebecca floating, face down, in the middle of the pond.  Moulton also testified he

jumped
out of the truck, ran around the dam and took my boots off and dove head first
into the pond.  I took maybe two strokes
towards [Rebecca] and I rolled her over and I noticed that her lips were blue
and her eyes were rolled back into her head. 
I started swimming back to the shallow end of the pond loosing [sic] her
a couple of times because I was going under. 
I got her to the bank getting her halfway out.  

 

He performed CPR for four to five
minutes, retrieved his cell phone from his truck, and called 9-1-1.  Below is the 9-1-1 conversation:

Dispatcher:  9-1-1. 
Do you have an emergency?

 

Moulton:  Yes.

 

Dispatcher:  What’s going on?

 

Moulton:
 My wife, she’s fell in the pond.

 

            . . . .

 

Dispatcher:
 Ok. 
Where are you?

 

Moulton:
 I’m David Moulton.  I’m at 2610 South Williams.

 

            . . . .

 

Moulton:  I can’t get her out, hurry.  

 

Dispatcher:
 Alright.  I’m going to get somebody up there. 

 

Advance firefighter and paramedic
Daniel Camp responded to the call around 8:00 p.m., along with Tim Tolleson, who was driving an ambulance, and Captain Dale
Godwin.  Moulton, who appeared concerned,
upset, panicked, and wet, said, “Help my wife, you’ve got to come and help my
wife.”  Moulton led the crew to
Rebecca.  Camp found that Rebecca “was
laying on her back, probably about -- the lower half of her body was still in
the water, from waist -- waist down.”  With Moulton’s assistance, 140-pound Rebecca
was pulled out of the water, and CPR was started, but proved unsuccessful.  The crew “put her on a backboard and into the
back of [Moulton’s] truck,” which was able to drive up the hill to the
ambulance.  Camp testified he did not
suspect a neck injury and that there was no jugular vein distension or
distortion or movement of the trachea. 
The emergency medical assessment was “[s]uspected
accidental drowning.”  Rebecca was taken
to the hospital with Moulton in tow. 
Dean was notified at 8:05 p.m. that Rebecca was in an ambulance.  

            Moulton’s
recollection of what occurred when emergency personnel arrived differs from
Camp’s testimony in a few respects. 
First, Moulton said, 

They
went to putting her on a gurney, trying to climb up that hill, and they dropped
her a couple of times.  We put her in the
back of my truck and I drove her up the hill right to the back door of the
ambulance. . . . and then for about 15 or 20 minutes worked on her in the
ambulance while I was ranting and raving to get her to the hospital because she
needed to be in front of a doctor.

 

Camp and Godwin both testified that
Rebecca was never dropped from the gurney. 
During interviews after her death, Moulton claimed that a small wound on
Rebecca’s neck was caused by a brass nipple on a C collar.  But Camp testified that no C collar was
placed on Rebecca. 

            Rebecca
arrived at the hospital in “[f]ull arrest.”  Based on what was known at the time, her
medical records reflected “drowning victim found in pond,” and the mechanism of
injury was listed as “drowning.”  Moulton
was soon joined at the hospital by various family members.  When the Byrums
arrived at the hospital “someone said, She choked on pizza and fell in the
pond.” When asked to speculate, Moulton “thought she had drowned,” or may have
been nauseated and/or choking on pizza when she fell in the pond.  Rebecca’s daughter Stephanie Diane Byrum testified that while in the hospital, Moulton told
her, “I didn’t think you would like me anymore.”  “He just kept repeating, I’m so sorry.”  Monique Irwin, Moulton’s daughter from a
prior marriage, also arrived at the hospital. 
She 

asked
[her] husband and [her] cousin to please take [Moulton] home because there were
people who were drunk and making threats.

 

. .
. . 

 

I
know [Rebecca’s] brother Ricky and his wife got into my face, very close
proximity when I was standing next to my grandmother and called my dad bad
names and saying that he killed her and those kinds of things.

 

Moulton went home, while other
family members remained at the hospital. 


            B.        The Investigation  

            Detective
Mark West was called at 10:00 p.m. to begin an investigation of the
incident.  West called for Moulton to
return to the hospital.  While waiting,
West photographed the body.  On the back
of Rebecca’s legs, he noticed what appeared “to be a drag mark right here,
mud,” and “what appeared to be an injury.” 
West obtained Moulton’s statement recounting the evening’s events.  He was cooperative and invited West into his
home.  West confirmed Moulton had
received the pizza and had met with James for the tree trimming job.  However, West stated, “Later on, we learned
that his -- from another [unidentified] witness, he was there about ten
minutes,” instead of the initial twenty to twenty-five minutes Moulton recited
in his statement and thirty to forty-five minutes he testified to in his
deposition.  West also confirmed that
Moulton had placed telephone calls to Dean and Leigh Soloman’s
number, which “turned out to be a computer line.”  From what West could see, there was nothing
out of place in the Moulton home, and he did not believe he had probable cause
to search the home further.  

            West
examined the pond area the next day. 
Hardly any evidence was retrieved since the scene had been trampled on
by paramedics and family members who had been to the pond since Rebecca’s
death.  The pond was approximately seven
to seven and a half feet deep.[3]  “[T]here was no impression or anything where
someone might have taken a fall into the pond” and no disturbances around the
edge of the pond suggesting Rebecca had tried to crawl out.  West remembered that no mud was present under
her fingernails.  He noted that she was
wearing flip-flops to traverse the dense wooded area and leafy trail.  To him, it did not appear as if Rebecca had
just fallen in.[4]  

            C.        Medical Findings/Initial Autopsy Report

            The
autopsy of Rebecca’s body was supervised by Dr. Joni McClain.  “The lateral sclerae
of the right eye [was] hemorrhagic,” which McClain testified could be caused by
“[s]ome sort of blunt trauma” directly to the eye
prior to death.  Because there was no
blunt trauma around the eye, the sclerael hemorrhage
could have been caused by the extraction, via needle to the eye, of vitreal fluid, which takes place at the hospital prior to
autopsy.  Also, there was no petechiae present in the eye, which is seen in eighty-five
percent of manual strangulation cases. 
Rebecca had some sign of neck injury close to the collarbone.  A “3/16 inch angulated red mark,” probing
“less than 1/8” of an inch was “present on the anterior neck base just left of
midline near the jugular notch,” there was puncture of the skin in that area,
and Rebecca had “a one inch area of soft tissue hemorrhage within the fat just
below the defect.”  Along the right side
of the neck, Rebecca had “[a] 1/2 inch area of intramuscular hemorrhage involv[ing] the superior aspect
and inferior surface of the right sternocleidomastoid
muscle” and a “3/8 inch intramuscular hemorrhage involv[ing] the inferior aspect of the right sternohyoid
muscle.”  Additionally, there were “1/16
inch superficial lacerations [involving] the mucosal surface of the lower lip
of the mouth.” 

            Curiously,
there were no bruises or abrasions to the surface of Rebecca’s neck area, and
the autopsy showed that “[t]he remainder of the neck dissection [was]
unremarkable and the hyoid bone and thyroid cartilage [were] intact.”  As explained by defense expert witness, Dr.
Robert Bux, “the hyoid bone is the little bone that
is above the larynx or the voice box. 
It’s a U-shaped bone and its purpose is to give stability to the upper
part of the airway.”  “[T]he larynx is
the voice box . . . it keeps, again, the structure open so you can breathe in
and out without it collapsing, without the trachea collapsing and the upper airway
collapsing when you breathe.”  Bux stated there was no way to know whether the 3/16-inch
red mark near the jugular notch was a pre- or post-death injury.  However, first responder Camp testified there
was no jugular vein distension and no signs of neck injury, although medical
records establish that the neck was examined. 
At the hospital, no signs of injury to the neck were documented.  There were also no signs of struggle on
Rebecca, which would be expected from a healthy adult fighting for their life.[5]  A toxicology screen produced no results, and
no foreign DNA was found under Rebecca’s fingernails.  

            Because
Rebecca’s “[h]eavy lungs with froth in large airways”
contained “edema, intra-alveolar hemorrhage and aspirated food,” some sort of
asphyxia may have been suspected, but was not listed as the medical cause of
death (it is possible this was the result of resuscitation efforts).  The initial autopsy produced the finding that
Rebecca “died as a result of undetermined causes.”  There was no testimony that any of the
injuries noted in the autopsy were life threatening.  Under a section labeled “comment,” the report
also stated:  “Based on investigation and
injuries found at autopsy, this case is suspicious for homicide.  Should additional information become
available, the cause and manner of death may be amended.”  This statement was based on a report created
by Justice of the Peace (J.P.) Taylor Mayfield which, Detective West admitted,
contained inaccurate statements. 
Specifically, the J.P.’s report stated that “they are investigating the
husband’s possible involvement in this incident” during a time when West stated
they were only “investigating the death.” 
The report also stated “J.P. Mayfield reports a long history of domestic
violence, confirmed through the Atlanta Police Department records,” when, in
fact, the police department had no record of domestic violence calls concerning
Rebecca.  While the report stated that “[t]he
decedent’s brothers told J.P. Mayfield of the reoccurring domestic violence
incidents involving the decedent and her husband,” West did not verify that
Rebecca’s brothers made such allegations when he interviewed them.  This report was gathered through
conversations Mayfield had with family members at the hospital after the time
of death was announced.  This report was
the only “history” of domestic violence provided to the medical examiner when
they deemed the case “suspicious for homicide.”  McClain testified, “At that point we didn’t
feel like we could go ahead and call it a homicide.  

            D.        Amended Autopsy Report/Affidavits 

            The
report was amended (over a year later), not because of additional medical
evidence, but due to the delivery of several affidavits obtained by West.  The affidavits, while not admitted as
exhibits, were read into the record over objections.  Summaries of the contents of the affidavits
are listed below:

Patty
Byrum Affidavit: 
“Every time I saw Becky she had those earrings on.”  “I also know that Becky had a necklace that
she wore.  The necklace is a cross with
emerald stones.”[6] 

 

Kayla
Williams Affidavit:  “Jamie
told me that Monique told her that Monique had seen drag marks behind the house
in the woods.”  “Jamie told me that they
saw a bare footprint on the back porch. 
The foot print was visible because it was a muddy foot print.” 

 

Jeff
Walraven Affidavit:  Was drinking and smoking marihuana with
Moulton and they became pretty drunk. 
Moulton said, “‘I wish I could get rid of my wife.’  I was not sure what David meant by that.” 

 

Jessica
Jeffcoat Affidavit:  Rebecca “did not like going down to the
pond.  My aunt did not like the
outdoors.”  

 

Allen
Williams Affidavit:  “I
went to David’s house to get his guns.”  “He
didn’t know if he was going to take his own life or someone else’s life.  I went over to his house and picked the guns
up and noticed that the front door [sic] in the foyer at the front door had been
torn up.  David said the wood flooring
that had been put down had buckled and he removed it.”  “I know that there is no reason to remove the
padding if he was going to replace the wood floor.”  

 

Ted Burkhalter Affidavit:  David asked me about my ex-wife and said it
would be cheaper to kill a woman than to divorce a woman.  “I think this was about seven years ago.”  “Another time David told me that he would
never get a divorce, that it would be cheaper to kill a woman than divorce one.”  

 

Janet
Giles Affidavit:  “David
was very controlling of Rebecca and he would not let Rebecca associate with me
or her other friends.”  During “the first
year and a half of their marriage, I was visiting Rebecca in her trailer.”  “David was not at home at the time and I saw
that Rebecca had one black eye.”  “I
asked Rebecca if David gave her the black eye. 
Rebecca told me that, yes, he did. 
She started making excuses for David, saying he was mad.”  “I know that Rebecca was a very strong
swimmer. . . .”  “I know that Rebecca did
not like the bugs or snakes and was not the type of person to wander into the
woods.”

 

Joey
Byrum Affidavit:  “On Wednesday, May 5, 2004, I was at home and
David Moulton called me.”  He said, he
thought the Fouches burned his house and if the autopsy
came back and there are drugs in her system, “I’m going to get those son of a
bitches because I know for a fact that they are making methamphetamine and that
date rape drug.”   

 

Sandra
Sandifer Affidavit:  “I considered Rebecca Moulton my best friend and
we talked together a lot.  We would talk
a lot about our personal lives and family. 
Rebecca shared quite a bit of her personal thoughts with me.  The last time I saw Rebecca was at church at
the Westgate Baptist Church on Sunday April 11, 2004.  Everything was fine with her.  She never told me about David doing anything
to harm [her] and Rebecca would have told me if there had been anything
happening.  Rebecca and I talked about
that specifically early during her marriage with David and she told me that she
told David that she was not raised where men hit women and the first time he
ever did that to her, she would leave. 
Rebecca told me she and David were doing well in their marriage and she
told me that in the last couple of weeks before her death.  She told me that their financial situation
was doing much better than it had been. 
I really do not believe that David had anything to do with Rebecca’s
death.”  

 

Sandifer Supplemental Affidavit:  “After my initial statement I recalled that a
few weeks before Becky’s death she called me very upset because she said David
had returned to drinking alcohol.”  “She
was upset because she said she didn’t like how David acts when he is drinking.”
 “I have never been around David when
drinking until recently.  He is
completely different when drinking.  I
think he might be capable of great violence when under the influence of
alcohol.”  “I have now talked to my
daughter Kayla who got a lot of new information from Stephanie.  Most of it Stephanie has told me now.  She said David’s current drinking started
causing them problems.  She said her
dad’s stories were starting to contradict each other.  She said that she tried very hard to back him
up, but now she truly feels that her dad killed her mom.”  

 

Elizabeth
Browning Guerra Affidavit:  “I
saw Rebecca in the store again on the 15th of April 2004 and I saw her walk
through the store.”  “Rebecca then smiled
at me and raised her sunglasses and I saw that below her right eye was a deep
redness, below her right eye and in her right eye.”  “I also remember an incident in the store two
years ago that Rebecca told me David held her face into a pillow and she also told
me that she was gasping for air.  I think
this was just after their house had burned. 
I asked her why she was not fighting and she told me she couldn’t
because she couldn’t breathe.  When I
asked her why he did that, she said tempers were short and it was hot and we
were closed in.” 

 

Leigh
Soloman Affidavit:  “Regarding the death of Rebecca Moulton, I was
Rebecca’s friend and associated with Rebecca quite a bit.  We went walking for exercise and would talk
about different things.  Rebecca told me
that her and David were getting along fine and there were no major problems
between them.  I honestly think that if
there had been any problems, Rebecca would have told me.”  “I called David Moulton Sunday night, April 18,
2004, and he told me about Rebecca and he said he tried to call me and that I
did not have an answering machine.  I
have two numbers listed in the telephone book. 
The first number is for the computer and does not have a caller
identification and no answering machine.” 
“I know Rebecca was definitely scared of snakes.”

 

            These
affidavits were provided to the medical examiner’s office, who then amended the
autopsy report with a revised cause of death, changing the report from
“undetermined” to “homicidal violence,” and the manner of death to
“homicide.”  

            At
trial, McClain stated that the injuries could be indicative of death by
asphyxiation.  She clarified that “[i]n this particular case we feel the mechanism of death is
some sort of asphyxia.  Could be
drowning, could be strangulation, could be suffocation.[7]  We can’t specifically pick which one, because
when you deal with an asphyxial type death, the findings
are very subtle.”  She claimed that the
injuries did not happen by themselves and that some force was applied. 

            E.        Prior Relationship/Trial Testimony
Regarding Abuse 

            Guerra
testified at trial in addition to signing an affidavit.  She testified that she would see Rebecca on
occasion while shopping.  One day (date
uncertain) at Wal-Mart, Rebecca was “really withdrawn,” and “had some makeup on
that was the kind you buy to cover bruises, scars, and things like that.”  Guerra knew that Rebecca did not wear much
makeup.  She “noticed that [Rebecca] had
bruises on the right side of her face” and under her jaw.  Guerra also testified about her sighting of
Rebecca in a hardware store in April 2004. 

She
was bruised bad, again, that day. . . . She again had bruises on the right side
of her face.  She had bruising in her
eye.  She had bruising on her, of her
right arm.  I put my arm around her and put
my arm on it, where the bruise was, and she kind of winced and pulled her
sleeve, half sleeves, bruised.  Fingerprints
on her arm.

 

Guerra testified Rebecca “said she
could not get out of the relationship she was in.  She was afraid to walk away and she was
scared to stay.”  

            Soloman, who had also signed an affidavit, testified that she
“went walking and shopping” with Rebecca and that Rebecca told her there were
no major problems in her marriage.

            Rebecca’s
mother, Dean, said she only saw bruises on Rebecca one time––during the
building of the Moulton’s second home (the first one burned in a fire).  Sometime prior to Christmas of 2003, Dean
testified,

[T]he
side of [Rebecca’s] face, from her temple down was blue, dark blue.  But she had makeup -- I had talked to her
fifteen minutes before, and I hadn’t noticed it looking directly at her, but
when that sunlight hit her face I could see that dark blue spot, and I said,
Becky, what happened to your eye?  And
she said, I ran into one of those poles, one of those boards.  

 

Dean claimed that Rebecca did not
appear to be scared or reluctant to go home. 


            Moulton’s
relatives, including Lela Wilbanks and Kevin Irwin,
testified that they had never seen bruises on Rebecca.  Melissa Byrum,
Rebecca’s niece, testified that she visited her aunt on the day of her death,
did not see any bruises on her, and claimed Rebecca did not seem upset. 

            Stephanie,
Rebecca’s daughter who Moulton adopted, described Moulton as “quick to
temper.”  Her testimony was based on
incidents that occurred seventeen years ago when she was ten years old.  Stephanie testified the relationship “was
really bad and rocky.  They argued a lot
and fought a lot.”  Although she
testified, “I saw a lot of him hitting her,” Stephanie did not testify to an
incident where she actually saw Moulton hit Rebecca.  There were three incidents Stephanie
recalled.  First, she once saw Moulton
swing at her mother with a closed fist and miss.  Next, 

[O]ne
night they were fighting again and -- I had just -- this time I just heard it
and heard them, him hitting her, and she was crying.  And after he left, I went back and saw my mom
in the bedroom, and she was laying on the floor and covered from head to toe in
bruises, and she couldn’t get up and just laying there.  

 

The last incident was one where

[T]hey
were arguing again, and this time Mom decided that she was going to leave, and
so she grabbed me and the keys and we tried to get out of the house, but he was
following us outside and so, he managed to grab the keys out of her hands and
threw them to the creek beside the house, and so while he was still yelling and
stuff, we were searching the ground to try to find the keys, and then we
finally found them and were able to leave. 


 

Stephanie told no one about the
abuse at the insistence of her mother.  

            Although
he claimed that he had nothing to do with Rebecca’s death, Moulton never denied
the domestic abuse.  

            Q         Well,
you testified that during your marriage to Becky, you slapped her around four
or five times.  

            A         That’s
right.  

            Q         But
that was early in the marriage, right?  

            A         That’s
right.  

            Q         And
I think you told me that in the last ten years of your marriage there wasn’t
any physical abuse, very little.  Was
there some?  

            A         I
would say a couple of times.  Yes, there
was. 

 

Moulton called the abuse “mutual”
and stated Rebecca could be physically abusive when she did not take her
medication.  He claimed that the last
time he slapped her was eight or nine years before her death.  Moulton admitted that the couple was having
marital problems, that he moved into a motel, and that he thought about
divorcing Rebecca around February 2003.

            F.         Questions Arise After the Funeral

            Stephanie,
who described her relationship with Moulton as “very tense,” came to believe
Moulton “had done something.”  Stephanie
found the circumstances of her mother’s death odd.  Specifically, she said her mother would not
go for a walk to the pond, and would instead stay on the road.  Stephanie reasoned that her mother would not
traverse the leafy trails and dense woods with flip-flops because there were
snakes and briars.  She also found it odd
that her mother was not wearing her necklace and earrings, which she wore all
of the time.  When she saw her mother’s
jewelry at the funeral home, Stephanie questioned why the delicate chain on the
necklace was broken.  

            Contrary
to Stephanie’s testimony, several of Moulton’s relatives testified that they
had observed Rebecca walking without wearing any jewelry.  Monique Irwin, Moulton’s daughter, testified
that Rebecca did not wear any jewelry, that she “never recall[ed] seeing her wear a necklace,” and that Rebecca was
outdoorsy and had a garden.  Moulton
claimed that Rebecca was not wearing any jewelry and that her necklace was broken.  

            Stephanie
also questioned Moulton’s behavior after Rebecca’s death.  Moulton did not give Stephanie any money to
purchase a tombstone for Rebecca.  He
talked about selling the house prior to the funeral.  Stephanie testified, “I was suspicious along
the way, but I didn’t want to say anything until I had an autopsy report, and
so that’s when I got -- it was confirmed.” 


            Dean
was also confused about Moulton’s behavior after Rebecca’s death.  When asked what flowers to get for the
funeral, Moulton replied, “Get whatever you want, I don’t care.”  Dean testified, “Lela asked him, she said,
David, do you have something that you loved to see her in, that you loved to
see her?  And he said, I ain’t picking out clothes for no woman.”  When Dean confronted him about the suspicious
nature of Rebecca’s death, Moulton said “that we were turning Stephanie against
us because we were accusing him and that she was not going to have anything
else to do with us.”  Dean testified that
it “appeared that David had lied” with respect to whether Stephanie was upset
with Dean or did not want to have anything to do with her.    

            G.        Money and Marital Issues 

            Stephanie
said money was a source of tension in the relationship.  Speaking of insurance proceeds from the
destruction of the couple’s first home, Stephanie said that “Mom pretty much
controlled the money and so David didn’t have access to it, and then he got
really angry about it and then left for a couple of weeks and they were going
to divorce, basically. . . . It was in a safety deposit box, and only Mom and
me were on the deposit box.”  The couple
did not divorce, and when Moulton came back, he had access to the money in the
safety deposit box, some of which he used to buy a six- or seven-year-old used
work truck because his other one “had been totaled.” 

            Moulton
revealed that Rebecca was the breadwinner. 
He was injured on the job, received workman’s compensation, claimed on
tax forms that he was disabled and received no income, but still took jobs trimming
trees.  They owed the IRS $39,000.00 and
had a debt of $9,165.00 on a travel trailer at the time of Rebecca’s
death.  For household expenses, Rebecca
borrowed against her savings.  In the
past, Moulton experienced two farm equipment fires, and the first house on the
property had burned down.  Moulton
collected insurance money for the three separate instances.  He also collected on Rebecca’s life insurance
benefits.  On the form, he said, “All the
information we can gather, it appears that my wife’s death was from natural
causes, aspiration of food.”  This
statement was made even though the autopsy report was “suspicious for
homicide.”  In any event, the insurance
company had a copy of the first autopsy report. 


            After
deliberating over the above-mentioned evidence for five hours, the jury
rendered a verdict of guilt.

II.        Trial Court Did
Not Err In Overruling Moulton’s Motion to Quash the Indictment

             In a three paragraph indictment, the State
alleged “DAVID LEN MOULTON did then
and there knowingly or intentionally cause the death of an individual, namely,
Rebecca Moulton, by manual strangulation by holding the said Rebecca Moulton’s
neck with the said defendant’s hand in a manner that would cause death by
asphyxiation,” “did then and there knowingly or intentionally cause the death
of an individual, namely, Rebecca Moulton, by drowning the said Rebecca Moulton
in a pond,” and “did then and there knowingly or intentionally cause the death
of an individual, namely, Rebecca Moulton, by asphyxiation by means unknown to
the grand jury.” 

            We
review de novo a trial court’s denial of a motion to quash.  Lawrence
v. State, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007).  A charging instrument which
tracks the language of a criminal statute possesses sufficient specificity to
provide a defendant with notice of a charged offense in most circumstances.  State v.
Edmond, 933 S.W.2d 120, 128 (Tex. Crim. App. 1996) (citing Bynum v. State, 767 S.W.2d 769, 778
(Tex. Crim. App. 1989); DeVaughn v. State, 749 S.W.2d 62, 67 (Tex. Crim.
App. 1988)).  The indictment must state
facts which, if proved, show a violation of the law; the indictment must be
dismissed if such facts would not constitute a criminal offense.  Posey v.
State, 545 S.W.2d 162, 163 (Tex. Crim. App. 1977). 

            Moulton
does not argue in his brief that the indictment failed to provide him with
notice of the crime for which he was charged. 
Rather, he complains that because the State’s indictment was written in
the disjunctive,[8] it
alleged the factual impossibility that Moulton murdered Rebecca three
times.  This led to the complaint in the
motion to quash that “[t]he alternate theories may lead to surprise of the
defendant at trial making him unable to adequately prepare and defend this
case” and that the “alternate theories may lead to a verdict which, in effect,
dispenses with the constitutional requirement of ‘jury unanimity.’”  

            As
to the claim that the indictment alleged three different murders, a factual
impossibility that would lead to surprise, “[a] count may contain as many
separate paragraphs charging the same offense as necessary, but no paragraph
may charge more than one offense.”  Tex. Code Crim. Proc. Ann. art.
21.24(b) (West 2009).  The Texas Court of
Criminal Appeals “has held that alternate
pleading of the differing methods of committing one offense may be charged
in one indictment.”  Kitchens, 823 S.W.2d at 258.  

            We
find that the State’s indictment was properly pled in accordance with Article
21.24 of the Texas Code of Criminal Procedure. 
Pursuant to Article 21.24, the State alleged that the same crime was
committed either by manual strangulation, drowning, or asphyxiation by manner and
means unknown.  Further, “[a] count is
sufficient if any one of its paragraphs is sufficient.  An indictment, information, or complaint is
sufficient if any one of its counts is sufficient.”  Tex.
Code Crim. Proc. Ann. art. 21.24(c) (West 2009).  

            As
to the argument regarding jury unanimity, the manner and means of committing
this offense is not required to be found unanimously by a jury.  Jefferson
v. State, 189 S.W.3d 305, 311 (Tex. Crim. App. 2006); see also Sanchez v. State,
No. PD-0961-07, 2010 WL 3894640, at *7 (Tex. Crim. App. Oct. 6, 2010).  Indeed, the United States Supreme Court has
determined that “there is no general requirement that the jury reach agreement
on the preliminary factual issues which underlie the verdict.”  Schad v.
Arizona, 501 U.S. 624
(1991) (plurality opinion); McKoy v. North
Carolina, 494 U.S. 433, 449
(1990); Kitchens, 823 S.W.2d at 258.  Therefore, an indictment can allege different
manner and means of committing a crime, including manner and means unknown,
without rendering the indictment duplicitous. 
Zanghetti,
618 S.W.2d at 386–87.  In Kitchens, the Texas Court of Criminal
Appeals rejected claims of failure to require juror unanimity where the trial
court submitted one application paragraph for capital murder which had been
alleged in three separate paragraphs of the indictment.  823 S.W.2d at 257.  Because the jury was not required to find the
manner and means of Rebecca’s death unanimously, Moulton was not entitled to a
motion to quash based on this argument.  

            We
overrule his first point of error. 

III.       Submission of the
Manner and Means Unknown Allegation Was Erroneous

            Our
review of error in this jury charge involves a two-step process.  Abdnor v. State,
871 S.W.2d 726, 731 (Tex. Crim. App. 1994); see
also Sakil v. State, 287 S.W.3d 23, 25–26 (Tex.
Crim. App. 2009).  Initially, we determine
whether error occurred, and then evaluate whether sufficient harm resulted from
the error to require reversal.  Abdnor, 871 S.W.2d
at 731–32.  

            After
the evidence closed, the trial court charged the jury that it could find
Moulton guilty if it found he caused Rebecca’s death: 

by
manual strangulation by holding the said Rebecca Moulton’s neck with the said
defendant’s hands in a manner that would cause the death by aspiration; or, 

. .
. drowning the said Rebecca Moulton in a pond; or, 

. .
. by asphyxiation by manner and means unknown; . . . . 

 

            The
jury was further instructed that it was not necessary to unanimously agree as
to whether the death was caused by manual strangulation, by drowning, or by
asphyxiation by manner and means unknown, but the jury members had to
unanimously agree that Moulton intentionally or knowingly caused the death. 

            Moulton
argues that the trial court erred in overruling his objections to the jury
charge.  Specifically, he complained that
submission of the manner and means unknown allegation was not supported by the
evidence.  Moulton argues he was harmed
by the submission of “asphyxiation by manner and means unknown” because the
evidence was legally insufficient to establish the State’s two alternate
theories, manual strangulation and drowning. 


            We
believe that a history of caselaw involving manner
and means unknown allegations is helpful to the disposition of this point of
error.  We begin our discussion with Corbett v. State, 493 S.W.2d 940 (Tex.
Crim. App. 1973).  Prior to the
introduction of the hypothetically correct jury charge concept, the State was
required to prove, with sufficient evidence, the elements contained as alleged
in the indictment.  Where the indictment
alleged that the means of causing death was unknown to the grand jury, such an
allegation was considered material and was required to be proved by the
evidence at trial.  Id. at 952.  This requirement
was deemed sufficiently met if the facts at trial demonstrated that the means
of death was uncertain.  Id.  However, where the evidence at trial showed
that the means were known or could have become known through the exercise of
reasonable diligence, the State was required to prove that the grand jury in
fact exercised due diligence, but was unable to decipher the means of
committing the offense.  Id.; Hicks
v. State, 860 S.W.2d 419, 424 (Tex. Crim. App. 1993), overruled by Rosales v. State, 4 S.W.3d 228 (Tex. Crim. App.
1999).

            This
requirement became known as the Hicks
rule.  Generally, the issue was raised
when the sufficiency of evidence was challenged.  Because the contention in such cases was that
the evidence at trial was insufficient to prove that the manner and/or means
were unknown, and the manner and means unknown allegation was considered a material
allegation which the State had to prove, challenges came in the form of
allegations that there were fatal variances between the indictment and
evidence.  Hicks, 860 S.W.2d at 424–25; Corbett,
493 S.W.2d at 953.  If the evidence at
trial did not establish the manner and means as unknown, the State either
called a member of the grand jury to testify that they exercised due diligence,
but were unable to determine the manner and/or means, or elicited such
testimony from witnesses who interacted with the grand jury.  Hicks,
860 S.W.2d at 424–25; Corbett, 493
S.W.2d at 953; Guerra v. State, 690
S.W.2d 901, 907–08 (Tex. App.—San Antonio 1985, no pet.).[9]

            In
1997, the Texas Court of Criminal Appeals reasoned that analyzing sufficiency
of the evidence based upon the indictment and resulting jury charge given
“permit[ted] the greatest form of relief in the criminal system -- an acquittal
-- to be granted because the defendant received a windfall in the jury
instructions,” Malik v. State, 953 S.W.2d 234, 239 (Tex.
Crim. App. 1997).  Thus, the Texas Court
of Criminal Appeals announced 

sufficiency
of the evidence should be measured by the elements of the offense as defined by
the hypothetically correct jury charge for the case.  Such a charge would be one that accurately
sets out the law, is authorized by the indictment, does not unnecessarily
increase the State’s burden of proof or unnecessarily restrict the State’s
theories of liability, and adequately describes the particular offense for
which the defendant was tried.  

 

Id. at 240. 
In effect, Malik
“changed the analysis so that the indictment as presented [was] not the basis
by which sufficiency of the evidence is now measured.”  In re
A.J.G., 131 S.W.3d 687, 694 (Tex. App.—Corpus Christi 2004, pet. denied). 

            In
light of Malik,
the concept of a manner and means unknown allegation in the jury charge was
revisited in Rosales.  4 S.W.3d at 230.  Rosales
held that the due diligence requirement was met when a member of the grand
jury testified the jury was unable to determine the manner and means.  Id. at
231.  While Rosales applied the Hicks rule,
it also stated that the Hicks rule,
requiring the State to prove that a manner and means was unknown, was no longer
viable in light of Malik.  This led to confusion among the courts as to
whether failure to prove manner and means unknown, where alleged in the State’s
indictment, was still considered a material variance in light of Malik.  

            When
faced with a similar situation, we stated in Fagan that the purpose for the Hicks
rule “is to ensure that a defendant will have adequate notice of the charge
against him and to guard against weakening the adequacy of notice that may be
caused by a variance[10]
between the allegation and the proof.” 
89 S.W.3d at 249.  While acknowledging Malik and its progeny holding
that a jury charge need not incorporate allegations giving rise to immaterial
variances, we stated:

The
Texas Court of Criminal Appeals has expressly disavowed the “due diligence”
rule set out in Hicks.  We therefore conclude that the rule has lost
its underpinning as well as any reason for its existence.  As required by Gollihar, we now look directly to
issues of notice and the materiality of any variance between the indictment and
charge to see if reversible error is present.  Accordingly, although the state may still be
required to show that the grand jury exercised due diligence in providing
adequate notice to the defendant, the rule requiring the state to show that the
grand jury exercised due diligence in determining the instrumentality of the
offense is no longer relevant to our analysis except as it might apply to a
review of adequacy of notice. 

 

Id.  We
concluded Fagan was given proper notice by an allegation of sexual abuse by use
of his sexual organ or with an object unknown to the grand jury.  The evidence sufficiently supported a finding
of assault by the use of the sexual organ. 
Id.  

            In
a case which was designated to be published, but has not yet been released due
to pending motions for rehearing, the Texas Court of Criminal Appeals has
agreed with our rationale in Fagan. 
Sanchez, 2010 WL 3894640.[11]  Sanchez
reiterated that the Hicks rule is no
longer viable, not only due to the holding in Malik, but because while Hicks was based upon the premise of
notice to a defendant, as we stated in Fagan,
the Hicks rule postponed the “unknowness” inquiry until the trial, and was thus
ineffective.  Id. at *1, 4–5 (recognizing split among courts of appeals).  Sanchez
quoted our State Constitution for the fundamental concept that “no person shall
be held to answer for a criminal offense unless on an indictment of a grand
jury, except in cases in which the punishment is by fine or imprisonment, otherwise
than in the penitentiary . . . ,” reiterated the importance of the concept that
“the grand jury’s failure to determine the manner and means must be pled in the
indictment in order to give notice to the defendant,” and created a new
procedure allowing a challenge to the unknown allegation on the basis of
improper notice, both before trial and at the conclusion of the presentation of
evidence.  Id. at *4 nn.20, 21 (quoting Tex.
Const. art. I, § 10; Garrett v.
State, 682 S.W.2d 301, 308 (Tex. Crim. App. 1984)).  

            In
Sanchez, the Texas Court of Criminal
Appeals found that the Hicks rule
requiring proof of the unknown manner and means had morphed into one affecting
jury charges and sufficiency of evidence challenges and had lost both its
intent and focus, causing it to be easily misunderstood and misapplied.  Id.
at *4.  Consequently, the Hicks rule was overruled and a new
standard or procedure for testing the “unknown” allegation was adopted to
assure the defendant has fair notice of the charges and to clarify the jury
charge.  Id.[12]

            Here,
we can eliminate the issue of whether Moulton received adequate notice of the
charges in the indictment. Since the indictment contained allegations regarding
both an “unknown” manner and means and also specific ones, Moulton was not
denied proper pretrial notice to defend the crime for which he was charged; the
remaining issue involves the propriety of the jury charge in light of the
evidence presented.  

            This
new standard directs the trial courts and attorneys to review the evidence of a
manner and means “unknown” allegation at a charge conference and clarify if the
evidence justifies a submission that the manner and means were truly unknown or
whether specific acts were shown to constitute the manner and means of the
commission of the crime.  In Sanchez, the jury charge was erroneous
“because the indictment contained an allegation of ‘manner and means’ to the
grand jury unknown” when the manner and means were not truly unknown. 

            Cases
such as Fagan and Sanchez, where the manner and means is
not an element of the offense, do not involve the sufficiency of the evidence
under Malik,
requiring acquittal.  Id. Rather, they involve (1) whether
adequate notice has been given to prepare for trial and  (2) evidence actually presented requires
that “unknown” allegation be replaced in the jury charge with language that
requires a particular fact to be found in order to convict.  The remedy for such a trial error, unless it
is found to be harmless, is a new trial. 
Id. at *6.  

            In
order to address the merits of Moulton’s claim, we first analyze the facts in Sanchez and its reasoning.  In that case, two guests in a motel room
called police after hearing a woman screaming in the room next door.  Id. at
*1.  Officers rushed into the adjoining
room to discover Sanchez lying next to the body of his dead girlfriend.  Id.  Her neck and face were bruised, and there
were distinctive marks of a stun gun on the skin of her neck and chest.  

            In
four disjunctive paragraphs, the State alleged Sanchez did then and there:

(1)
“intentionally and knowingly cause the death of [the victim] by choking her with
his hand;”

(2)
“intentionally and knowingly cause the death of [the victim] by manner and
means to the Grand Jurors unknown;”

(3)
“with intent to cause serious bodily injury to an individual . . . commit an
act clearly dangerous to human life, to-wit:  by placing a stun gun on the person of the
said [victim], that caused the death of said [victim];” and

(4)
“with intent to cause serious bodily injury to [the victim], commit an act
clearly dangerous to human life, to-wit: by manner and means to the Grand
Juror[s] unknown, that caused the death of said [victim].”

 

Id.  

            Asphyxia
by strangulation was listed as the cause of death on the autopsy report, and
asphyxia was defined as lack of oxygen to the brain.  Id.  However, at trial, the medical examiner testified
he could not conclusively determine what caused the asphyxia, although his
findings were “consistent with an asphyxia by strangulation.”  Id. at
*1–2.  The examiner could not conclusively determine
whether manual strangulation or the stun gun caused the asphyxia.  Id. at
*1.  

            On
appeal, and as presented in this case through the briefing and objection to the
charge below, the issue was jury charge error with regard to the submission that
asphyxiation was by a manner and means unknown. 
Id. at *4.  Sanchez
recognized that for murder, “[n]either the manner-the actus reus-nor the means-the ‘instrument of
death’ -need be found unanimously by a jury.” 
Id. at *7.[13]  

            The
court explained that “manner and means to the grand jury unknown” could be
either unknown evidence, or unknowable evidence.  Id. at
*7.  

“Unknown”
evidence is evidence that cannot be or has not yet been ascertained, such as a
murder weapon or perhaps even the cause of death.  “Unknowable” evidence, however, differs from
the failure to find evidence.  It is
evidence that has been ascertained, but cannot be comprehensively known.  In essence, it is the difference between an
open-ended question and a multiple-choice question which gives several options
to the finder of fact.  When all evidence
that can be produced is produced, but it is impossible to determine manner and
means, then the manner and means is “unknowable.”

 

Id. at *7.  

 

            The
court reasoned that the medical cause of death was asphyxia and that what
caused the asphyxia was at issue.  Id.  Thus, the State was not required to prove that
the defendant asphyxiated the victim, but rather, that “the legal element of
the crime, which is that the appellant caused the death of the victim.”  Id.  There, the court explained that the manner and
means “could have been manual strangulation, ligature strangulation, blocking
the air passages, or the use of the stun gun, or even any combination of these
methods.”  Id.  But because the medical
examiner testified the manner and means “was either by strangulation or by the
stun gun, or even by a combination of the two,” these were the only manner and
means which could have been presented to the jury.  Id.
at *7–8.  Sanchez recognized that after all of the evidence that could be
produced was produced, it was not possible to determine the manner and means of
the asphyxia.  Id. at *8.  Therefore, the
manner and means was unknowable.  Id. at *9.  In other words, the testimony presented a
known choice of several options.  Because
the testimony presented a known choice of several options, the manner and means
was not “entirely unknown.”  Id. 
Thus, the jury charge should have been amended to remove the submission
of “manner and means unknown,” and should have, instead, simply given the jury
the multiple choices presented by the evidence.  In those circumstances, the jury should not be
given the option to determine guilt by a finding that the manner and means of
death were unknown, but “should be replaced by language in the charge that
requires a particular fact to be found in order to convict.”  Id.
at *5.  

            Moulton’s
argument reiterates that according to Sanchez,
submission of the “manner and means unknown” allegation in this case, where the
manner and means was unknowable, constituted error.  In oral argument, the State candidly conceded
that if this Court applies Sanchez,
the charge was erroneous, but the State urges that it is a harmless error.  Employing Sanchez’s
reasoning, as well as our reasoning in Fagan,
we conclude the charge was erroneous.  

            Here,
the indictment read in three separate paragraphs that “DAVID LEN MOULTON did . . . cause the death of . . . Rebecca
Moulton, by manual strangulation by holding the said Rebecca Moulton’s neck
with the said defendant’s hand in a manner that would cause death by
asphyxiation,” “did then and there knowingly or intentionally cause the death
of . . . Rebecca Moulton, by drowning . . .” and “did . . . cause the death of .
. . Rebecca Moulton, by asphyxiation by means unknown to the grand jury.”  The medical examiner in this case testified
that while she believed Rebecca’s death was caused by asphyxia, the means “[c]ould be drowning, could be strangulation, could be
suffocation.  We can’t specifically pick
which one, because when you deal with an asphyxial
type death, the findings are very subtle.”  

            Thus,
as in Sanchez, after all of the
evidence that could be produced was produced, there was a known choice of
several options.  These were the options
which should have been submitted to the jury because the manner and means was
not entirely unknown.  Id. at *9.[14]  Therefore, as in Sanchez, the jury charge should have been amended to remove the
submission of the manner and means unknown allegation, and failure to do so
resulted in the submission of an erroneous jury charge.[15]  

IV.       The Erroneous Jury
Charge Submission Amounted to Some Harm to Moulton 

            Even
if the submission of the charge was erroneous, “the judgment shall not be
reversed unless the error appearing from the record was calculated to injure
the rights of defendant, or unless it appears from the record that the
defendant has not had a fair and impartial trial.”  Tex.
Code Crim. Proc. Ann. art. 36.19 (West 2006).  “Preserved jury charge error is evaluated
under Almanza’s ‘some
harm’ standard unless [it is] determine[d] that the error is constitutional in
nature, in which case the ‘beyond a reasonable doubt harmless’ standard would
apply.”  Williams v. State, 273 S.W.3d 200, 224
(Tex. Crim. App. 2008); see Almanza, 686 S.W.2d at 171.  In Sanchez,
the Texas Court of Criminal Appeals found that Sanchez’s objection that the
manner and means were unsupported by evidence was sufficient to preserve error.  Sanchez,
2010 WL 3894640, at *2.  Here, the record
establishes that Moulton objected to the “submission of all three paragraphs of
the indictment.”  At trial, he complained
that the submission “invit[ed]
less than a unanimous verdict” and that “there’s no credible cause of death
evidence concerning . . . . asphyxiation by an unknown means.”  We find Moulton’s objection sufficiently
preserved the issue; thus, we will employ the Almanza “some harm”
standard.  

            “[T]he
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of the
probative evidence, the argument of counsel and any other relevant information
revealed by the record of the trial as a whole.” Almanza, 686 S.W.2d at 171. 

            A.        Jury Charge Instructions 

            Analysis
of the jury charge suggests there was some harm to Moulton.  The application paragraphs of the jury charge
instructed the jury to find Moulton guilty if it found he manually strangled
Rebecca, or drowned Rebecca, or asphyxiated her by manner and means unknown.  As previously stated, the trial court
instructed the jury that it did not need to unanimously agree whether Moulton
caused the death by strangulation, drowning, or asphyxiation by manner and
means unknown, but only had to be unanimous that Moulton intentionally or
knowingly caused Rebecca’s death.  

            Finally,
the question asked of the jury was simply whether it found Moulton ‘“[g]uilty’ of the offense of murder as alleged in the
indictment.”  Because submission of the
third option was error, and the nature of the charge could have provided for conviction based upon the manner and means
unknown allegation, there is a possibility
that Moulton suffered some harm from the erroneous submission.  However, “a defendant must have suffered
‘some’ actual, rather than theoretical, harm from the error.”  Arline v. State,
721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (citing Almanza, 686 S.W.2d at 171).  Because only theoretical harm is shown from
the charge itself, we move to an analysis of the evidence.  

            B.        The Evidence 

            In Sanchez, the trial court instructed the
jury to consider several alternative means of the cause and manner of death,
one of which was “unknown.”  Even though
such a submission of “unknown” means was an error, the Texas Court of Criminal
Appeals, employing the Almanza “some harm” standard, considered
whether the error was harmful.  In
finding no harm, the court explained that not only was there “sufficient
evidence” to prove at least one of the alternate means (other than “unknown”),
but also that the evidence “overwhelmingly” supported a conviction on
alternative theories.  Consequently, the
error in submitting an “unknown” manner and means where the manner and means
was actually not entirely unknown, did not cause harm.  Sanchez,
2010 WL 3894649, at *9.  This analysis
was to measure the harm “at least in part, against the likelihood that the
jury’s verdict was actually based upon an alternative available theory of
culpability not affected by erroneous portions of the charge.”  Id.
(quoting Atkinson v. State, 923 S.W.2d
21, 27 (Tex. Crim. App. 1996), overruled
on other grounds by Motilla v. State, 78 S.W.3d 352 (Tex. Crim.
App. 2002)).  “‘The presence of
overwhelming evidence of guilt plays a determinative role in resolving the
issue,’ and is indeed a factor that can be considered when looking at jury
charge error.”  Id.  

            In
accordance with Almanza,
we will review the “state of the evidence” as well as the weight of the
probative evidence.  Almanza, 686
S.W.2d at 171.  

            In
its entirety, the autopsy report lists the following as evidence of injury:

The
lateral sclerae of the right eye is hemorrhagic.  A 3/16 inch angulated red mark is present on
the anterior neck base just left of midline near the jugular notch.  The injury probes to less than 1/8 inch and a
layered neck dissection reveals a 1 inch area of soft tissue hemorrhage within
the fat just below the defect.  A 1/2
inch area of intramuscular hemorrhage involves the superior aspect and inferior
surface of the right sternocleidomastiod muscle.  A 3/8 inch intramuscular hemorrhage involves
the inferior aspect of the right sternohyoid
muscle.  The remainder of the neck
dissection is unremarkable and the hyoid bone and thyroid cartilage are
intact.  

 

Two
1/16 inch superficial lacerations involve the mucosal surface of the lower lip
of the mouth.  The sphenoid sinus is
opened and contains thin clear fluid. 

 

We will examine the autopsy report
and expert testimony to analyze the evidence that Rebecca was manually
strangled or drowned, injury by injury.  

            Dr.
McClain testified that “[t]he lateral sclerae of the
right eye” could be caused by “[s]ome sort of blunt
trauma” directly to the eye prior to death. 
Additionally, there were “1/16 inch superficial lacerations [involving]
the mucosal surface of the lower lip of the mouth.”  Blunt force trauma to the eye and the superficial
lacerations on Rebecca’s mouth do not provide any evidence relating to manual
strangulation or drowning, as opposed to another manner and means of
asphyxiation.  

            The
State points out that Rebecca had some sign of neck injury close to the
collarbone.  A “3/16 inch angulated red
mark,” probing “less than 1/8” of an inch was “present on the anterior neck
base just left of midline near the jugular notch,” there was puncture of the
skin in that area, and Rebecca had “a one inch area of soft tissue hemorrhage
within the fat just below the defect.” Along the right side of the neck,
Rebecca had “[a] 1/2 inch area of intramuscular hemorrhage involv[ing] the superior aspect and inferior surface of the right sternocleidomastoid muscle,” and a “3/8 inch intramuscular
hemorrhage involv[ing] the
inferior aspect of the right sternohyoid muscle.” 

            These
injuries, however, were not described in the autopsy as injuries which caused
Rebecca’s death.  Rather, they were
described as small and superficial injuries, and no witness testified that the
injuries to Rebecca’s neck were life threatening.[16]  No petechiae was
present in the eye, which is seen in eighty-five percent of manual
strangulation cases.  Also, there were no
bruises or abrasions to the surface of Rebecca’s neck area, and the autopsy
showed that “[t]he remainder of the neck dissection [was] unremarkable and the
hyoid bone and thyroid cartilage [were] intact.”  As explained by defense expert witness, Dr. Bux, “the hyoid bone is the little bone that is above the
larynx or the voice box.  It’s a U-shaped
bone and it’s [sic] purpose is to give stability to the upper part of the
airway.”  “[T]he larynx is the voice box
. . . it keeps, again, the structure open so you can breathe in and out without
it collapsing, without the trachea collapsing and the upper airway collapsing
when you breathe.”  Bux
stated there was no way to know whether the 3/16-inch red mark near the jugular
notch was a pre- or post-death injury. 
However, first responder Camp testified there was no jugular vein
distension, and no signs of neck injury, although medical records establish
that the neck was examined.  At the
hospital, no signs of injury to the neck were documented.  There were also no signs of struggle on
Rebecca, which would be expected from a healthy adult fighting for their life.[17]  A toxicology screen produced no results, and
no foreign DNA was found under Rebecca’s fingernails.  The initial autopsy, which was amended, but
not as a result of additional medical evidence, produced the finding that
Rebecca “died as the result of undetermined causes.”  Further, even if we looked at this evidence in
the light most favorable to the judgment, no evidence was presented that such
injury to the neck was the result of manual strangulation caused by pressing
the hand to the neck, as opposed to ligature strangulation, or some other
method of strangulation.  

            As
to the allegation of drowning, Detective West testified there were no signs of
struggle on the body or around the pond area. 
There was no mud or foreign DNA under Rebecca’s fingernails.  The autopsy report reflected pulmonary edema
and intra-alveolar hemorrhage, which McClain testified were nonspecific
findings that while seen “in drownings,” is seen
“really in every autopsy.”[18]  There was mention of thin clear fluid in the
sphenoid sinus, which McClain also regarded as nonspecific.  Emergency medical personnel who cleared
Rebecca’s airways did not note fluid in her lungs, though the assessment was
listed as “suspected accidental drowning.”  Although the medical records list the
complaint as “drowning victim found in pond,” this statement was the initial
assessment based upon information gathered from Moulton that his wife fell in
the pond.  Drowning was not mentioned in
the autopsy report.  Again, McClain
testified that her office was unable to determine the cause of death with this
medical evidence.

            Given
the state of the evidence, the means which caused Rebecca’s death is
unclear.  While jury unanimity is not
required as to the manner and means, in Sanchez
the evidence  “overwhelmingly” supported
a conviction that death occurred in accordance with alternate theories alleged
in the indictment.  (The expert testified
he was ninety-five percent sure that asphyxia was the result of manual strangulation,
the defendant was found lying next to the decedent in a motel room registered
in his name, his vehicle was parked in front of the room, and there was no
alternative means of exiting the room.) 
Such overwhelming evidence was sufficient to remove any harm from jury
charge error in the submission of the manner and means unknown allegation.  Here, the State’s expert could not provide
such definitive evidence and stated that the asphyxia “[c]ould
be drowning, could be strangulation, could be suffocation.”  Further, she stated, “I can’t tell you if it
was strangulation, if it was suffocation, if it was drowning, or a combination
of all three.”  

            It
is the obligation and responsibility of appellate courts “to ensure that the
evidence presented actually supports a conclusion that the defendant committed
the crime that was charged.”  Winfrey v. State, 323 S.W.3d 875, 882
(Tex. Crim. App. 2010) (citing Williams
v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).  Furthermore, “[i]f
the evidence at trial raises only a suspicion of guilt, even a strong one, then
that evidence is insufficient [to convict].”  Id. (quoting
Urbano v. State, 837 S.W.2d 114, 116 (Tex.
Crim. App. 1992)), superseded in part on
other grounds by Herrin v. State, 125 S.W.3d 436, 443 (Tex. Crim. App.
2002).  At best, we know that Moulton had
been at home with Rebecca around the time of the killing, that he had committed
domestic violence in the past which could lead to an inference of intent to
kill, that Rebecca died an unnatural death, that she had neck injuries, and that
her necklace was broken.  Homicide is
suggested by virtue of the fact that West suggested drag marks were present on
Rebecca, McClain testified the injuries caused were inflicted, and the fact
that Rebecca was found in flip-flops in the middle of a pond.  Moulton’s strange story that she was dropped
from a gurney and that he witnessed a C collar being placed on her does not
favor him.  Nevertheless, we conclude,
under our Almanza analysis, that the evidence of the cause
and manner and means of death of the alternative theories, alone, does not rise
to the level to remove the harm resulting from the improper jury charge as it
did in Sanchez.  One of the theories suggested was
suffocation, which was neither alleged in the indictment nor presented to the
jury.  Therefore, we believe the state of
the evidence favors Moulton when addressing whether he was harmed by the manner
and means unknown allegation. 

            C.        Argument of Counsel 

            During
closing argument, the State said, “All twelve of you don’t have to agree on how
he killed her.  What you have to agree
upon is that he killed her on April 17, 2004.” 
This would have been a correct statement were it not for the erroneous
submission of the manner and means unknown allegation.  The State focused on the manner and means
unknown allegation when it argued:

Dr. Bux . . . said petechiae appear
in 80, 85 percent and there ought to be a struggle.  But we know historically that when David
Moulton had attacked Becky Moulton there were some times that there wasn’t a
struggle, because -- and Elizabeth Browning said, ‘Why didn’t you fight back?’  ‘I couldn’t. 
I couldn’t breathe.’  

 

There’s
only two people that know what happened out there.  One of them’s dead
and the other one’s sitting behind me. 
That’s why we had to plead this case as a manner and means unknown.  We don’t have to prove to you exactly what
happened on that day.  We have to prove
to you beyond a reasonable doubt that David Moulton’s responsible . . . .  

 

Also, rather than try to prove
death by manual strangulation or drowning, counsel argued, “How he got to her,
I’m not exactly sure.  Did he asphyxiate
her?  I know that beyond a reasonable
doubt.  How he did it exactly, I don’t know.”[19]  The jury was read a statement given by
Elizabeth Browning that Moulton had previously suffocated Rebecca with a pillow
and that she was unable to struggle at that time because she could not
breathe.  McClain also testified to
suffocation as opposed to manual strangulation or drowning. 

            We
find that counsel’s argument supports the argument that Moulton suffered some
harm from the submission of the manner and means unknown allegation because
this allegation, coupled with testimony regarding suffocation, became the focus
of the closing argument.  

            After
reviewing the entire jury charge, the evidence, and argument of counsel, we
conclude that submission of the erroneous manner and means unknown allegation
to the jury resulted in “some harm” to Moulton under the Almanza analysis.  We sustain this point of error.  

V.        Admission
of the Inadmissible Affidavits Under a Rule 705 Balancing Analysis Was Not
Erroneous 

 

            Moulton
complains that the trial court erroneously allowed the hearsay affidavits[20] contained in McClain’s file to be read
into the record based on Texas Rules of Evidence 703 and 705. 

            We
review the trial court’s admission of evidence for an abuse of discretion.  State v. Dixon, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006); Zuliani v. State, 97 S.W.3d 589, 595 (Tex.
Crim. App. 2003); Harris v. State,
133 S.W.3d 760, 770 (Tex. App.—Texarkana 2004, pet. ref’d).  An abuse of discretion occurs only when the
trial court’s decision “was so clearly wrong as to lie outside that zone within
which reasonable persons might disagree.”  Harris,
133 S.W.3d at 770–71 (quoting Cantu
v. State, 842 S.W.2d 667,
682 (Tex. Crim. App. 1992)).  We will
uphold the trial court’s ruling if it is reasonably supported by the record and
is correct under any applicable legal theory. 
Dixon, 206 S.W.3d at
590. 

            When Dr. McClain initially was
questioned by the State, she revealed that the autopsy report had been amended
based on investigative findings presented after the autopsy was performed.  At that time, the State did not attempt to
present the additional underlying investigative facts the expert reviewed.  During cross-examination of McClain, Moulton
suggested the statements could have been unreliable.  

            Rule of Evidence 703 “allows expert
opinion testimony that relies on facts or data collected or reported by another
when those facts or data are the type ‘reasonably relied upon by experts in the
particular field in forming opinions.’. . . even if the underlying facts or
data are themselves inadmissible.”  Tex.
Worker’s Comp. Comm’n v. Wausaw
Underwriters Ins., 127 S.W.3d 50, 56–57 (Tex. App.—Houston [1st Dist.]
2003, pet. denied).  After defense
counsel’s cross-examination of McClain, the State moved to be allowed to read
the affidavits that were supplied to McClain: 

            Q         And Dr. McClain, there are the kinds of
statements that you would typically rely upon in your job as a medical examiner
in arriving at a conclusion in terms of cause of death?  

            A         That’s correct.  

            Q         And in fact, you did that in this
case?  

            A         Yes, I did. 

            Q         Based on those statements?  

            A         Yes. 


 

The
trial court allowed the affidavits to be read into the record.  

            The concern is the actual disclosure
of the inadmissible facts or data, as opposed to McClain’s opinion.  Rule 705 of the Texas Rules of Evidence,
entitled Disclosure of Facts or Data Underlying Expert Opinion reads:

(d)  Balancing test; limiting instructions.  When the
underlying facts or data would be inadmissible in evidence, the court shall
exclude the underlying facts or data if the danger that they will be used for a
purpose other than as explanation or support for the expert’s opinion outweighs
their value as explanation or support or are unfairly prejudicial.  If otherwise inadmissible facts or data are
disclosed before the jury, a limiting instruction by the court shall be given
upon request. 

 

Tex. R. Evid. 705.

            When conducting this balancing test,
the trial court made reference to counsel’s cross-examination of McClain, in
which Moulton questioned the veracity of the affidavits which were used to form
McClain’s opinion:  

            Q         [Referencing the affidavits] . . . . And
once again, we go back to that garbage in-garbage out theory . . . .

 

            A         Well, these -- what I have are sworn
statements and I don’t think that’s garbage from somebody.  

 

            Q         Well, I’m not saying that’s garbage
either, but our common human experience tells us that people can -- I’m not
going to start out with lie; I’m going to start out with, be mistaken.  True?

 

            A         Well, you know, if you’re making a
statement, you’re saying what you believe to be true.

 

            Q         I think you may be mistaken about
that.  Isn’t that possible, Doctor? 

 

            A         It could be.  I’ve got more than one statement.  

 

            Q         Okay. 
That’s fair enough.  But you’ll
agree with me that sometimes people, their memory fades?

 

            A         Yes. 


 

            Q         Sometimes they might outright lie?

 

            A         Well, they might. 

 

Moulton
then went on to question certain statements that were contained within the J.P.’s
report, suggesting they were false.  

            After reading Rule 705, the trial
court stated:

Where we are now though is, is that defense has
significantly called into question the validity of the medical examiner’s
conclusions on the basis that the investigative facts that she relied upon were
so questionable that it then taints the opinions that she’s made.  That leaves -- that opens the door to the jury
being able to evaluate the investigative materials to determine whether or not the
basis for her opinion are valid.  

 

The
trial judge clarified, “I think by questioning the validity of the opinions and
the basis that those facts supporting the opinions are invalid, that opens the
door to the admissibility of the hearsay and, . . . the hearsay evidence is
admissible as a basis for the expert’s opinion. . . . 703 and, in connection
with 705(d), allows it to come in even if it would not otherwise be admissible
into evidence.”  The trial court thus
addressed the underlying facts or data’s value as explanation or support for
McClain’s opinion.  

            As to the danger that they will be
used for a purpose other than as explanation or support or unfair prejudice,
the judge ruled:

Now I think that in light of the fact that this
door has been opened that that -- that mitigates against any danger of unfair
prejudice, because now the jury has got to determine what she looked at as a
basis for her opinion to determine the validity of it and what weight to be
given to the opinions of the expert.  

 

Although
prejudicial, the court determined it would not be unfair to allow reading of
the affidavits.  In clarifying that his
ruling was based upon the need for the jury to decide if McClain’s opinion was
supported by the affidavits and was reasonable, the trial court decided that
there was no great danger that the affidavits would be used for a purpose other
than as explanation or support for the expert’s opinion.  During trial, Moulton did not argue that the
affidavits were unfairly prejudicial, and he did not request a limiting
instruction under Rule 705(d).[21]  

            Moulton’s complaint on appeal,
however, regards the finding that the affidavits were not unfairly prejudicial.
 The argument, in its entirety, is
presented below:

It is Appellant’s position that the statements
should not have come in because they are unfairly prejudicial.  Of all the statements read by Dr. McClain, only
one of the declarants was called as a witness by the
State at trial.  Appellant was not given
the investigative file containing the statements prior to trial.  Appellant had no way of combating this information
when it was introduced, nor could Appellant’s counsel conduct any investigation
to confirm the reliability of the statements. 
As a result, the statements were unfairly prejudicial to Appellant, and
the trial court abused its discretion by permitting Dr. McClain to read the
same to the jury.

 

            Rather than describing why a
particular statement or statements were unfairly prejudicial, Moulton’s
argument raises other issues not before the trial court.[22]  

            We are left with the simple
allegation that the affidavits were unfairly prejudicial. According to the
reasoning employed by the trial court, disclosing the statements McClain relied
upon in forming her opinion assisted the jury in evaluating the weight to give
her opinions.  See Austin v. State,
222 S.W.3d 801, 812 (Tex. App.—Houston [14th Dist.] 2007, pet. ref’d) (citing Ramirez v. State, 815 S.W.2d 636, 651
(Tex. Crim. App. 1991)).  Although the
statements were prejudicial and there was some risk the jury might use them for
another purpose, we conclude the trial court did not abuse its discretion in
determining this risk did not substantially outweigh their value as explanation
and support for McClain’s opinions.  See
Austin, 222 S.W.3d at 812.  Therefore,
we find the trial court did not abuse its discretion in allowing the reading of
the statements upon which McClain formed her opinion.

VI.       Moulton Waived His Brady Complaint 

 

            Last,
Moulton argues that Brady was
violated when the State failed to previously disclose the affidavits and
investigative materials on which McClain relied in amending the autopsy report
from “undetermined” “suspicious for homicide” to “homicide.”[23] 

            When
evidence withheld in violation of Brady[24]
is disclosed at trial, the defendant’s “failure to request a continuance waives
any Brady violation, as well as any
violation of a discovery order.”  Taylor v. State, 93 S.W.3d 487, 502
(Tex. App.—Texarkana 2002, pet. ref’d); Smith v. State, 314 S.W.3d 576, 586 n.3 (Tex.
App.—Texarkana 2010, no pet.); Jones v.
State, 234 S.W.3d 151, 158 (Tex. App.—San Antonio 2007, no pet.) (holding
defendant must request continuance and present Brady complaint in motion for new trial to preserve complaint for
appellate review); Apolinar v. State, 106 S.W.3d 407, 421 (Tex.
App.—Houston [1st Dist.] 2003), aff’d on other grounds,
155 S.W.3d 184 (Tex. Crim. App. 2005).  

            A
review of the record reveals that Moulton failed to request a continuance after
being presented with the investigative file. 
Therefore, any Brady violation
was waived.  Smith, 314 S.W.3d at 575 n.3 (‘“failure to request a continuance
waives any Brady violation’ and
indicates the evidence was, in fact, not material”).

VII.     CONCLUSION 

            Because
we find Moulton was harmed by the submission of the manner and means unknown
allegation in the jury charge, we reverse the trial court’s judgment and remand
for further proceedings consistent with this opinion.  

 

 

                                                                        Jack
Carter

                                                                        Justice

 

Date Submitted:          June
8, 2011

Date Decided:             October
19, 2011

 

Publish











[1]In
this opinion, we refer to David Len Moulton as “Moulton,” and Rebecca Moulton
as “Rebecca.”





[2]A
civil suit had been filed against Moulton, in which he gave testimony.  The testimony presented from Moulton
regarding this matter was read from previous testimony he gave in the civil
suit.  





[3]This
measurement was taken two to three months later.  





[4]Conversations
with neighbors did not lead to discovery of any evidence.  





[5]Dr.
Bux testified, “I’d expect to see multiple injuries
on the skin that could be either straight due to a finger coming in or raking
down, getting a scratch, or kind of -- an ellipse from a fingernail mark.  I’d expect to see other areas of bruising on
the surface of the skin, and abrasions. 
Those are the things that you typically see on the outside of the neck.”  





[6]Family
members found it odd that Rebecca was not wearing her jewelry when she was
found. 





[7]There
is no evidence that Rebecca had water in her lungs.  





[8]The
State responded to Moulton’s complaint that the indictment was disjunctive by
arguing that since the beginning of each paragraph started with the word “and,”
the indictment was pled in the conjunctive. 
We conclude that whether the indictment was conjunctive or disjunctive
is not a dispositive issue that the trial court was required to resolve at the
motion to quash stage of the proceeding. 
It has been held that “although the indictment may allege the differing
methods of committing the offense in the conjunctive, it is proper for the jury
to be charged in the disjunctive.”  Kitchens v. State, 823 S.W.2d 256, 258
(Tex. Crim. App. 1991) (citing Vasquez v. State, 665 S.W.2d 484, 486–87 (Tex. Crim. App. 1984), overruled on other grounds by Gonzales v.
State, 723 S.W.2d 746 (Tex. Crim. App. 1987); Zanghetti
v. State, 618 S.W.2d 383,
387–88 (Tex. Crim. App. 1981)).  Conversely,
it is appropriate where the alternate theories of committing the same offense
are submitted to the jury in the disjunctive for the jury to return a general
verdict if the evidence is sufficient to support a finding under any of the
theories submitted, and the same offense is being alleged.  Id. (citing
Aguirre v. State, 732
S.W.2d 320, 326 (Tex. Crim. App. 1987) (op. on reh’g);
Bailey v. State, 532
S.W.2d 316, 322–23 (Tex. Crim. App. 1976)). 
Also, if an indictment disjunctively alleges alternate theories of
committing the same result-oriented offense, they may be submitted
disjunctively in the jury charge without violating the right to jury
unanimity.  Gamboa v. State, 296 S.W.3d 574, 582–83 (Tex. Crim. App. 2009) (citing Kitchens, 823 S.W.2d at 258).  Of course, the key is whether the State was
alleging the same offense.  We conclude
that in this case, the State was alleging the same result-oriented offense. 





[9]Even
though the issue was usually raised as a sufficiency challenge, at times the
complaint was couched as a failure to provide proper notice to allow a defense
to an allegation that the manner and means were unknown.  Persons
v. State, 714 S.W.2d 475 (Tex. App.—Fort Worth 1986, no pet.).  





[10]A
variance between the wording of the indictment and the evidence presented is
fatal only if it is material and also prejudices the defendant’s substantial
rights.  In other words, if the
indictment fails to inform the defendant of the charge against him or her sufficient
to allow the defendant to prepare an adequate defense, and if the defendant
would be subjected to the risk of being prosecuted later for the same offense.  Fagan
v. State, 89 S.W.3d 245, 248 n.2 (Tex. App.––Texarkana 2002, pet. ref’d).  

 





[11]We realize that an opinion
that is not final is not a part of Texas’ jurisprudence.  Komurke v. State,
562 S.W.2d 230, 235 (Tex. Crim. App. 1978), overruled
on other grounds by Cooper v. State, 631 S.W.2d 508 (Tex. Crim. App. 1982);
see also Yeager v. State, 727 S.W.2d
280, 281 n.1 (Tex. Crim. App. 1987).  The
Sanchez opinion will not be final
until fifteen days after any motion for rehearing is ruled upon.  Tex. R.
App. P. 231.  Several motions for
rehearing were filed in 2010, and are still currently pending.  However, we feel that reference to this
important case is necessary.  Moreover,
although this case has no precedential value, we may take guidance from it “as
an aid in developing reasoning that may be employed.”  Carrillo
v. State, 98 S.W.3d 789, 794 (Tex. App.––Amarillo 2003, pet. ref’d).





[12]Sanchez made it clear that an indictment
alleging an unknown manner and means was still authorized, but it essentially
changed the inquiry concerning an “unknown” manner and means from the arena of
sufficiency of the evidence into a question of adequacy of notice and jury
charge error determinations. 





[13]But
again, the new standard’s main focus is on notice and the jury charge.  To this effect, the court defined the new
procedure:

 

Where
the State has alleged “unknown” manner and means in the indictment and/or jury
charge, the defendant may challenge the propriety of the “unknown” allegation
before trial and (if the evidence at trial has made a second inquiry necessary)
at the conclusion of evidence, but before the charge is submitted to the jury.

 

The
first question (whether raised before or during the trial) is whether the
defendant was given proper notice so that he could properly prepare for trial.  The second question is whether an “unknown”
allegation in the indictment should be replaced by language in the charge that
requires a particular fact to be found in order to convict.

 

The
pre-trial hearing will ensure that the “unknown” allegation was truly unknown
to the grand jury and is not being used to surprise or manipulate the defendant
at trial.  This hearing replaces the Hicks test, but does not require proof
of “unknownness” at trial.  Instead, it permits hearings that will, at the
very least, elicit all evidence that is now known so that the “unknown” aspect
of the case can be minimized or eliminated by amendment of the indictment or
the presentation of a superseding indictment.

 

Similarly,
a post-evidentiary hearing is available to the defendant by request after the
evidence has been presented and both sides have rested, but before the jury is
charged.  If the “unknown” allegation has
become known through the evidence presented at trial, it might still have been
unknown to the grand jury as stated in the indictment.  If this is the case, then the “unknown”
allegation has since been discovered and made known.  This additional hearing will force both sides
to revisit the “unknown” allegation from the indictment, and clarify that it is
either known, “unknown,” or unknowable, before the court completes its charge
to the jury.

 

Id. at
*5–6.





[14]We
realize this trial occurred before the Sanchez
decision was released and the attorneys and judge were not aware of the new
procedures established.  Nevertheless,
the issue ultimately is jury charge error which cannot be forfeited and only
has application to the level of review when considering whether error is
harmless.  Almanza v. State, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh’g).  In Sanchez,
the Texas Court of Criminal Appeals found the trial court erred even though it
announced the new procedure in that case. 

 





[15]Sanchez v. State, 221 S.W.3d 769 (Tex.
App.––Corpus Christi 2007), rev’d, No. PD-0961-07,
2010 WL 3894640 (Tex. Crim. App. Oct. 6, 2010) (Texas Court of Criminal
Appeals, in reversing, concluded submission of jury charge was erroneous).





[16]McClain
did testify that she has seen strangulation cases that are “very subtle; it
only takes a little bit of pressure to cut off the blood flow to the brain.  So it’s not like you’re having to, you know,
break someone’s neck; it’s just, you know, you cut off that blood flow and they
don’t get enough oxygen to the brain, they pass out and die.”  





[17]Dr.
Bux testified, “I’d expect to see multiple injuries
on the skin that could be either straight due to a finger coming in or raking
down, getting a scratch, or kind of -- an ellipse from a fingernail mark.  I’d expect to see other areas of bruising on
the surface of the skin, and abrasions. 
Those are the things that you typically see on the outside of the
neck.”  





[18]McClain
also testified that a body sinks when it is drowned.  According to Moulton’s testimony, Rebecca was
found floating in the pond.  





[19]The
Texas Court of Criminal Appeals stated, in the Sanchez opinion, “Since ‘cause of death’ is a medical term, the
State need not prove that the appellant ‘asphyxiated’ the victim.  Rather, the State must prove the legal element
of the crime, which is that the appellant caused the death of the victim.”  2010 WL 3894640, at *7. 

 





[20]The
affidavits, previously summarized, were not admitted into evidence.  





[21]During
trial, Moulton focused on admissibility of the affidavits under Rule 705(c). 

 





[22]For example, Moulton complains that only one
of the affiants was called by the State to testify at trial.  Reading the affidavits of those not available
to testify raises serious Crawford issues.  See Smith v. State, No.
09-09-00380-CR, 2011 WL 1304874, at *5 (Tex. App.––Beaumont Apr. 6, 2011, pet. ref’d) (“Clearly, the rules of evidence do not trump a
defendant’s constitutional right to confrontation.  See Crawford, 541 U.S. at 61.  When the facts and data in a report explain
and support a testifying expert’s opinions only when the underlying data and
facts are true, then the jury must consider the facts and data in the
inadmissible report as substantive, rather than merely constituting the
underlying basis for the expert’s opinion.  See Martinez v. State, 311 S.W.3d 104,
112 (Tex. App.––Amarillo 2010, pet. ref’d); Wood
v. State, 299 S.W.3d 200, 213 (Tex. App.––Austin 2009, pet. ref’d).  Under the
circumstances presented here, the trial court’s admission of this report over a
timely and specific objection was constitutional error.”)).  However, the issue was not raised to the trial
court, and a hearsay objection does not preserve error on Confrontation Clause grounds.  Reyna v. State, 168 S.W.3d 173,
179 (Tex. Crim. App. 2005); Paredes v.
State, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004).





[23]We
do not address the issues of whether such investigative materials, which were
used to amend the autopsy report to including a finding of homicide, could be
considered exculpatory.  

 





[24]Brady v. Maryland, 373 U.S. 83 (1963).